UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:26-mj-02562-Louis

FILED BY_____AR_____D.C.

Mar 26, 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

UNITED STATES OF AMERICA

Vs.

DAVID ESTEBAN GALLEGO HOYOS,

    Defendant

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? No.

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No.

3. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No.

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No.

Respectfully Submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:    /s/ Jonathan E. Jacobson
        JONATHAN E. JACOBSON
        Assistant United States Attorney
        Court ID No. A5503348
        99 NE 4th Street, 5th Floor
        Miami, FL 33132
        (202) 934-0886
        Jonathan.Jacobson3@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

## UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| David Esteban Gallego Hoyos, | ) | Case No.  1:26-mj-02562-Louis |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

FILED BY_____AR_____D.C.

**Mar 26, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

### CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____10/12/2025 - 10/26/2025_____ in the county of _____Miami-Dade_____ in the

_____Southern_____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 1344, 1343, 1028A | Conspiracy to commit bank fraud, wire fraud, and aggravated identity theft |
| 18 U.S.C. § 1201(c), 1201(a)(1) | Conspiracy to commit kidnapping |
| 18 U.S.C. § 1201(a)(1) | Kidnapping |
| 18 U.S.C. § 1344 | Bank fraud |
| 18 U.S.C. § 1343 | Wire fraud |
| 18 U.S.C. § 1028A | Aggravated identity theft |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Abdul Majeed, Special Agent, HSI
_____
Printed name and title

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by  FaceTime

Date:  March 26 2026
_____

_____
Judge's signature

City and state:  _____Miami, Florida_____

Honorable Lauren F. Louis, United States Magistrate Judge
_____
Printed name and title

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

Your Affiant, Abdul Majeed, being duly sworn, deposes and states as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the U.S. Department of Homeland Security's Homeland Security Investigations ("HSI"). I have been in this position since April 2021. My duties with HSI include, but are not limited to, the investigation of violations of federal laws governing kidnappings and fraud. I have received training in general law enforcement, including training in Title 8, Title 18, Title 19, and Title 21 of the United States Code. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to my current position as an HSI Special Agent, I was employed as a Sheriff's Deputy in Prince William County, Virginia, from 2015 to 2021. Based on my training and experience, I am familiar with the conduct of investigations to include bank and wire fraud, aggravated identity theft, and kidnapping investigations as well as the measures taken by criminal organizations to hide their criminality from law enforcement (for example, by using fictitious names, or names otherwise dissociated with their true identities, to prevent law enforcement from identifying them with their criminal behaviors). I have been directly involved in cases related to bank and wire fraud investigations where I have assisted with initial arrests and seized evidence of violations of federal law. In addition, I communicate regularly with other federal, state, and local law enforcement officers who are familiar with the manner in which these criminal organizations and individuals operate. Based on my training and experience, I am familiar with the methods used by certain fraudsters to identify and incapacitate their victims, gain access to their electronic devices, and subsequently their bank accounts, to facilitate fraudulent behavior. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7),

1

that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2.     The information provided in this Affidavit is for the purpose of establishing probable cause in support of a Complaint charging DAVID ESTEBAN GALLEGO HOYOS ("GALLEGO") with the following offenses:

- conspiracy to commit the following crimes: bank fraud, in violation of 18 U.S.C. § 1344; wire fraud, in violation of 18 U.S.C. § 1343; and aggravated identity theft, in violation of 18 U.S.C. § 1028A (all in violation of 18 U.S.C. § 371);

- conspiracy to commit kidnapping by decoy or inveiglement, in violation of 18 U.S.C. § 1201(c) and 1201(a)(1);

- kidnapping by decoy or inveiglement, in violation of 18 U.S.C. § 1201(a)(1);

- bank fraud, in violation of 18 U.S.C. § 1344;

- wire fraud, in violation of 18 U.S.C. § 1343; and

- aggravated identity theft, in violation of 18 U.S.C. § 1028A

(collectively, the "SUBJECT OFFENSES").

3.     The facts contained in this Affidavit are based on my personal knowledge and information provided to me by other law enforcement officers. This Affidavit is being submitted for the limited purpose of establishing probable cause for the proposed Complaint, and as such does not contain every fact known to me.

**PROBABLE CAUSE**

4.     Between on or about October 12, 2025, and on or about October 26, 2025, in the Southern District of Florida and elsewhere, GALLEGO—as well as others including two particular individuals known to law enforcement and referred to here as SUBJECT TWO and SUBJECT

2

THREE—engaged in a scheme to drug and steal from victims that the co-conspirators met on an online dating application. GALLEGO and these two co-conspirators (collectively, the "SUBJECTS") carried out their scheme by meeting typically older, ostensibly wealthy men (collectively, the "Victims") on online dating sites, drugging them, stealing their valuable possessions, and then accessing their financial and other accounts or creating new accounts without their knowledge or consent (and without the knowledge or consent of the financial institutions and other entities that held the Victims' accounts). A central objective of the scheme was for GALLEGO and his co-conspirators to gain unauthorized access to the financial resources and assets of the Victims and then to use funds derived from the scheme for their own personal benefit.

5. GALLEGO was born on or about December 10, 2003, and appears in the below photograph:



6. Investigators have developed information that the SUBJECTS have victimized individuals in the Southern District of Florida and elsewhere as part of their scheme. This Affidavit describes the events surrounding the SUBJECTS' efforts to drug and steal from four individuals: Victim-1, Victim-2, Victim-3, and Victim-4.

3

**I.     Victim-1**

7.     There is probable cause to believe that on or about October 12, 2025, GALLEGO and another individual drugged Victim-1 (a 67-year-old man), stole items from Victim-1's Miami residence, and then—along with SUBJECT TWO and SUBJECT THREE—used Victim-1's identity and financial accounts for their own personal benefit.

A.     Victim-1's Account

8.     According to Victim-1, on or about the evening of October 12, 2025, he was using an online dating application called Grindr when he "matched" with a male who identified himself as "David." Victim-1 agreed to have "David" come to Victim-1's residence. "David" asked if he could bring a friend, and Victim-1 agreed. Both "David" and the other individual arrived at Victim-1's Miami residence that evening. According to Victim-1, he and the other two men socialized at the residence and consumed red wine. Victim-1 described "David" as a Hispanic, Spanish-speaking male in his late twenties to early thirties, short in stature, with a skinny build and light complexion. Victim-1 described the other individual as a darker-skinned and heavy-set Hispanic male, who spoke Spanish and who claimed to be from the Dominican Republic. For reasons discussed in further detail below, there is probable cause to believe that this latter individual was in fact GALLEGO. Victim-1 stated that he felt normal while the two men were at his residence and that the two men subsequently left the residence.

9.     Approximately 36 hours later, on or about the morning of October 14, 2025, Victim-1 awoke feeling extremely ill, dizzy, and disoriented, causing him to believe that he had been drugged by the two men who had been at his residence on or about October 12, 2025. Victim-1 awoke in his bed to find that his dog had relieved itself on the bedroom floor, leading Victim-1 to believe it had been a long time since the dog had been outside. Victim-1 thereafter attempted to go

4

downstairs in his residence, but fell down the stairs. Victim-1 stated that he exited his residence in a visibly impaired state and that a property groundskeeper observed his condition and contacted 911. Miami Fire Rescue responded and Victim-1 was transported to Jackson Memorial Hospital for medical evaluation. Victim-1 recalled awakening in an emergency room, where he underwent a toxicology test. The toxicology test yielded a positive result for Benzodiazepine, a depressant that can have sedative effects. Victim-1 stated that he does not use this substance.

10.     Upon Victim-1's release from the hospital and return to his home, he noticed that he was missing his Apple iPhone 17; wallet; laptop computer; several European gold rings valued at approximately $1,000; approximately $1,000 in cash; and $2,500 worth of Euros he had set aside for an upcoming trip to Spain. Victim-1 then accessed his financial accounts and observed multiple fraudulent transactions, including purchases made at Apple Stores at the Dadeland Mall, the Falls shopping center (near Kendall), downtown Miami, and Brickell City Centre (among others). Victim-1 also discovered unauthorized transfers from both his personal bank account and his elderly mother's account, which he manages through linked mobile banking applications.

11.     Victim-1 advised that he distinctly recalled locking his door after the two males initially left. Victim-1 stated that he believed the males stole his house keys while they were present in the residence with him, drugged his wine, and later returned to the apartment while he was incapacitated. He stated that there were no signs of a forced entry.[1]

12.     There is probable cause to believe that one of the subjects who appeared at Victim-1's residence was in fact GALLEGO.

---

[1] Victim-1 initially informed law enforcement that he met with the two males on October 13, 2025, and then awoke on October 14, 2025. But subsequent interviews with Victim-1 and further investigation indicate that in fact Victim-1 likely met the two males on October 12, 2025, and that the volume of Benzodiazepines in his system may have caused Victim-1 to remain unconscious for over 24 hours until he awoke on October 14, 2025.

5

B.     Security Video Footage from Four Apple Stores

13.     After learning of Victim-1's account, law enforcement commenced an investigation.

14.     Law enforcement sought to obtain CCTV footage from four Miami-area Apple Stores where items had been purchased using Victim-1's stolen Mastercard ending in 4640. These purchases occurred on or about October 13, 2025, and October 14, 2025 (in the days following the drugging of Victim-1 on or about the evening of October 12, 2025). The CCTV footage collectively showed three individuals apparently working in concert to purchase a variety of Apple products.

15.     First, law enforcement obtained and reviewed CCTV footage from the Apple Store located at Dadeland Mall (7535 Dadeland Mall Circle West, in Miami, Florida). Video footage from the store reflected that on or about October 13, 2025, at approximately 1:00 p.m., three male subjects could be observed on camera footage in the vicinity of the store, with one subject entering the Apple Store and utilizing Victim-1's name and financial information to complete two purchases in less than 10 minutes for approximately $3,579.15 and $2,779.86. A still shot from the camera footage appears immediately below (with GALLEGO—wearing a black t-shirt with a distinctive circular logo that also appears in some of the below-described surveillance footage from other Apple stores—in the right side of the red circled area):

[remainder of page intentionally left blank]

6



Another still from this same surveillance footage captures GALLEGO once again:



16.     Second, law enforcement obtained and reviewed CCTV footage from the Apple Store at the Falls (located at 8888 Southwest 136th Street, in Miami, Florida). Video footage from the store reflected that on or about October 13, 2025, at approximately 2:51 p.m., GALLEGO used Victim-1's name and financial information to complete a purchase totaling approximately $1,068.93 (with $1,030 paid using a credit card in Victim-1's name and approximately $38.93 paid in cash). Two screenshots from the video footage appear immediately below (with GALLEGO, once again wearing the black shirt with the distinctive circular logo, circled in red):

7





Exterior surveillance showed SUBJECT TWO and SUBJECT THREE waiting outside during this transaction. At one point, at approximately 2:49 p.m., SUBJECT TWO entered the store and appeared to converse with GALLEGO.

17.     Third, law enforcement obtained and reviewed CCTV footage from the downtown Miami Apple Store (located at 100 Northeast 8th Street in Miami, Florida). Video footage from the store reflected that on or about October 13, 2025, at approximately 7:45 p.m., two males appeared to have used Victim-1's name and financial information to purchase Apple products. The footage from the Apple Store reflected that SUBJECT TWO and GALLEGO completed the fraudulent transactions. These purchases appear to coincide with two transactions on Victim-1's credit card (the first totaling $4,703.72 and the second totaling $5,878.58). A screenshot from the camera footage appears immediately below (with SUBJECT TWO's face circled in yellow and GALLEGO's face circled in red):

8



The footage also reflects that GALLEGO once again wore the same distinctive t-shirt with the circular logo on the back:



18.     Fourth, law enforcement obtained and reviewed CCTV footage from the Apple Store at Brickell City Centre (located at 701 South Miami Avenue in Miami, Florida). Video footage from the store reflected that on or about October 13, 2025, at approximately 11:48 a.m., three males entered the store and purchased multiple Apple iPhones for approximately $4,275.72 using Victim-1's name and financial information. The three males appeared to be acting in concert while making the fraudulent purchase. Still shots from the camera footage appear immediately

below (with GALLEGO, again wearing the same distinctive black shirt with the circular logo, circled in red, SUBJECT TWO circled in yellow, and SUBJECT THREE circled in green):





C.   Security Video Footage from the Dadeland Mall

19.   As indicated above, on or about October 13, 2025, the three SUBJECTS were observed at the Apple Store in Dadeland Mall. Investigators also obtained additional security

camera footage from the Dadeland Mall area. A screenshot from this footage shows GALLEGO (circled in red) holding the door while another individual entered the vehicle:



Additional surveillance footage of the vehicle shows GALLEGO in the front passenger seat (circled in red) and SUBJECT TWO (circled in yellow) driving the vehicle:



20.     Investigators determined that the white vehicle described above had been rented by a Colombian national referred to here as "M.A." The rental car was reserved on or about October

11, 2025. Investigators determined that M.A. traveled with GALLEGO from Colombia on or about October 12, 2025, from El Dorado International Airport in Bogota, Colombia, to Miami International Airport. Both M.A. and GALLEGO arrived via LATAM Airlines Flight Number 4400. SUBJECT TWO traveled on the same flight with both M.A. and GALLEGO.[2]

21.     Further footage showed the three SUBJECTS walking together in the Dadeland Mall, with the below screenshot showing (from left to right) SUBJECT THREE, SUBJECT TWO, and GALLEGO:



D.     <u>Additional Financial Impact of the Scheme on Victim-1</u>

22.     Victim-1 has provided law enforcement with evidence indicating that many of his financial accounts were compromised after October 12, 2025.

23.     Victim-1 informed law enforcement that his phone—which he believed to have been stolen by GALLEGO and the other individual—was protected by a four-digit passcode and/or "Face ID" (a facial recognition tool available on certain Apple products). Victim-1 did not provide his passcode or permission to use his phone to any other individuals. On his phone, Victim-1 had

---

[2] Because the rental car was booked before these individuals entered the United States, there is probable cause to believe that the booking required a wire communication in interstate or foreign commerce.

stored passwords to various applications, including, for example, his banking and Uber applications. Among other fraudulent schemes, the SUBJECTS appear to have used Victim-1's Apple iPhone to successfully apply for digital credit cards. Victim-1 provided the following details related to fraudulent activity:

24.     **USAA.** Victim-1 had auto and home insurance with USAA, a financial services company. Victim-1 provided a letter from USAA indicating unknown individuals at or around the time of the offense successfully applied for multiple credit cards with USAA. The cards were closed because of efforts to open multiple credit cards.

25.     **GOLDMAN SACHS APPLE CARD**. Victim-1 reported that an unknown individual or individuals successfully applied for an Apple credit card (issued, via an Apple partnership, by Goldman Sachs) and made the following unauthorized transactions totaling approximately $5,000:

October 14, 2025

- Apple Lincoln Road—$2,627.92
- Apple Lincoln Road—$1,336.38

October 15, 2025

- Associzion—$1.00
- Apple Miami World Center—$719.72
- Ray-Ban—$98.34
- Sephora—$211.86

26.     **FIDELITY INVESTMENTS**. On or about October 14, 2025, Victim-1's Fidelity Investments account had wiring instructions added. Victim-1 provided an email acknowledgment that he received on or about October 14, 2025, at approximately 4:10 a.m., indicating that wiring

13

instructions had been added and that funds could now be transferred electronically from his Fidelity Investments account.

27.     **CITIBANK**. At approximately this same time, an unknown individual or individuals were able to open a Citibank account in Victim-1's name. There was an attempt to transfer approximately $9,000 from a Fidelity Investments account to the new Citibank account. On or about October 15, 2025, at approximately 11:14 a.m., Citibank emailed Victim-1 indicating that the phone number on this account had been changed. Victim-1 did not open this account or initiate this change. On or about October 16, 2025, at approximately 4:50 a.m., Citibank emailed Victim-1 indicating that a new Citibank ATM/debit card had been shipped to his residence. Victim-1 did not request this card or open this account. On or about October 17, 2025, at approximately 3:48 a.m., Victim-1 received notification from Citibank indicating that a new loan application was processed. Victim-1 did not apply for a new loan.

28.     A number of fraudulent purchases were made on a Citibank credit card ending in 4640, issued in Victim-1's name. The Citibank credit card ending in 4640, in Victim-1's name, was used to make the following purchases (which were not authorized by Victim-1):

October 13, 2025

- Apple Store #R623—$548.93

- Apple Store #R012—$1,030.00[3]

- TOUS THE FALLS—$1,116.87

- Apple Store #R312—$2,779.86

---

[3] This purchase appears to be associated with the Falls Shopping Center Apple Store fraud perpetrated by the SUBJECTS, described above in paragraph 16 of this Affidavit.

14

- Apple Store #R312—$3,579.15[4]

- Apple Store #R623—$4,275.72[5]

- Apple Store #R623—$4,276.79

- Apple MIAMIWORLDCENTER—$4,703.72

- Apple MIAMIWORLDCENTER—$5,878.58[6]

- Apple Store #R012—$10,476.37

October 14, 2025

- Uber—$26.58

- Uber—$15.37

- Apple.com/Bill—$19.99

- Apple.com/Bill—$39.99

29.     Citibank was federally insured at all relevant times.

30.     **DADE COUNTY FEDERAL CREDIT UNION**. Victim-1 has an account at Dade County Federal Credit Union. According to Victim-1, numerous unauthorized transfers were made from Victim-1's account at this credit union to pay down the Citibank credit card ending in 4640 (which had been used to make the unauthorized purchases described in the preceding paragraph of this Affidavit). These transfers were for approximately $2,890.99 (on or about October 14, 2025)

---

[4] This purchase and the preceding Apple store purchase (for $2,779.86) appear to be associated with the Dadeland Mall Apple Store fraud perpetrated by the SUBJECTS, described above in paragraph 15 of this Affidavit.

[5] This purchase appears to be associated with the Brickell City Centre Apple Store fraud perpetrated by the SUBJECTS, described above in paragraph 18 of this Affidavit.

[6] This purchase and the preceding Apple Store purchase (for $4,703.72) appear to be associated with the downtown Miami Apple Store fraud perpetrated by the SUBJECTS, described above in paragraph 17 of this Affidavit.

15

and $38,710.65 (on or about October 16, 2025). Victim-1 provided a photocopy of the bank statement itemizing these transactions.

31.     **JPMORGAN CHASE & CO**. Victim-1 is the co-signer for a Chase checking account belonging to his mother, ending in 2603.

32.     On or about October 13, 2025 at approximately 8:32 p.m., Victim-1 received an email from Chase indicating that a new device, an iPhone 16 Pro, was used to sign into the account. Victim-1 did not register a new device with Chase at that date and time. One minute later, at approximately 8:33 p.m., Victim-1 received an email from Chase indicating the password to his bank account was changed. Victim-1 did not change his password at this date and time or authorize or approve anyone to change it on his behalf. Approximately 20 minutes later, at 8:52 p.m., Victim-1 received an email from Chase indicating that a new Slate Edge Credit Card application, in Victim-1's name, was under review. Victim-1 did not apply for or authorize a new credit card.

33.     On or about October 14, 2025 at approximately 9:31 a.m., Victim-1 received an email from Chase indicating the new Slate Edge Credit Card application was approved. Approximately three hours later, Victim-1 received an email from Chase indicating that the password to his bank account had been changed again. Victim-1 did not change his password at this date and time or authorize or approve anyone to change it on his behalf.

34.     On or about October 15, 2025 at approximately 5:58 p.m., Victim-1 received an email from Chase indicating that the unauthorized Slate Edge Credit Card had been added to his Apple Pay wallet for digital payments. Victim-1 did not authorize or approve this card or addition to his Apple Pay account. Victim-1 provided HSI with a Chase account statement detailing the following charges on the card (which were not authorized by Victim-1 or his mother):

October 14, 2025

16

- Apple Store #R623—$4,275.72

- MIA MIAMI SPRINGS FL—$29.01

- Apple Store #R623—$520.00

- Apple Store #R623—$2,137.86

- Apple MIAMIWORLDCENTER—$4,435.15

October 15, 2025

- Apple MIAMIWORLDCENTER—$2,700.00

- Apple Store #R623—$52.43

October 16, 2025

- Starbucks Store 78303—$30.00

35. On or about October 18, 2025, both M.A.—the woman who rented the vehicle used by the SUBJECTS at Dadeland Mall—and GALLEGO departed the United States on LATAM Flight Number 4403 from Miami International Airport to El Dorado International Airport. SUBJECT TWO also departed the United States on the same date, October 18, 2025, but via Emirates Airlines Flight Number 213 from Miami International Airport to El Dorado International Airport.

## II. Victim-2

36. There is probable cause to believe that on or about October 22, 2025, GALLEGO and SUBJECT TWO drugged Victim-2 and then stole approximately $15,000 worth of valuables from Victim-2's residence.

37. In or about mid-October 2025, Victim-2—a 62 year-old male residing in Miami Beach, Florida—communicated with an individual via the online dating application Grindr. The other individual informed Victim-2 that his friend was in town and wanted to meet for drinks. On

17

or about October 22, 2025—the same date that GALLEGO returned to the United States from Bogota, according to flight records—Victim-2 invited the individual (and his friend) to Victim-2's Miami Beach residence.

38.     The two individuals—believed to be SUBJECT TWO and GALLEGO—arrived at Victim-2's residence around 7:00 p.m. on October 22, 2025. Upon their arrival, Victim-2 and the other two individuals went to a convenience store located in Victim-2's building to purchase beer. Victim-2 recalled sitting on his balcony with the two individuals and having a beer or wine. Victim-2 believed that the meetup was for sex, but that the "chubby guy" (believed to be GALLEGO) appeared to be postponing a sexual interaction to drink and hang out. At some point, Victim-2 fell asleep. A few hours later, at approximately 3:30 a.m. on or about October 23, 2025, Victim-2 awoke on his couch covered by a blanket.

39.     According to Victim-2, he subsequently determined that a number of valuables in his home had been stolen. His Apple iPhone 16 Plus was missing. In addition, the two individuals had stolen approximately (a) $15,000 worth of jewelry (including four gold bracelets, a gold necklace, a two-tone Gucci watch, and a silver Movado watch), (b) $200 in cash, and (c) the key to Victim-2's vehicle. Victim-2 informed law enforcement that he did not use his Apple iPhone for banking or have any stored credit or debit cards in his Apple Wallet.

40.     Victim-2 reported the crime to his building's security office, who assisted in calling the police. Miami Beach Police Department officers responded. Fingerprints were collected from, among other items, a wine glass (two prints) and three beer bottles.[7] The prints were compared to fingerprints lifted from Victim-2 and from GALLEGO (who, as discussed below, was subsequently

---

[7] Additionally, swabs for potential DNA were taken off of the wine glass and the three beer bottles.

arrested in connection with related charges). GALLEGO's right middle and left middle fingerprints appeared to be the same as the fingerprints lifted from the wine glass.

41.    Surveillance footage from near Victim-2's building appears to show GALLEGO (circled in red) and SUBJECT TWO (circled in yellow) speaking with Victim-2:



## III.   Victim-3 and Victim-4

42.    There is probable cause to believe that on or about October 24, 2025, the three SUBJECTS drugged Victim-3 and Victim-4—two married males then aged, respectively, 60 and 59, who reside with each other in downtown Orlando, Florida. There is also probable cause to believe that the SUBJECTS thereafter stole items from Victim-3 and Victim-4's shared residence and then used identities and financial accounts associated with Victim-4 to purchase items for their own benefit.

### A.  The Accounts of Victim-3 and Victim-4

43.    According to Victim-3 and Victim-4, on or about the evening of October 24, 2025, Victim-3 began communicating on Grindr with a male individual. Victim-3 invited the individual and two of the individual's friends—believed, as discussed in greater detail below, to be the

SUBJECTS—to come to the residence shared by Victim-3 and Victim-4 in downtown Orlando, Florida. During these communications, the male individual provided the following three photos to Victim-3 (which appear to be of GALLEGO, SUBJECT TWO, and SUBJECT THREE):



SUBJECT TWO                    GALLEGO                    SUBJECT THREE

44.     Victim-3 met the three men near the intersection of East Livingston Street and Magnolia Avenue, at which time he escorted them to his residence on foot.

45.     Victim-3 and Victim-4 stated that they had approximately one alcoholic beverage each. But they indicated that the three males encouraged them to drink more. Prior to their arrival, Victim-3 and Victim-4 had not been drinking or using any other substances. While Victim-3 was in the basement of the residence, one of the males brought Victim-3 a glass of wine. Victim-3 stated that the wine tasted bitter and he stopped drinking it. Victim-4 drank beer and did not recall his beverage tasting unusual.

46.     According to Victim-3, at approximately 9:30 p.m., he went upstairs to the guest bedroom and passed out on the floor. Prior to losing consciousness, Victim-3 stated that the individual he knew as "George" (believed to be GALLEGO) picked him up and put him in bed.

47.     Victim-4 stated that he also blacked out and woke up at approximately 4:00 a.m. the following morning (that is, on or about October 25, 2025) to find that the house had been ransacked. The males had stolen the victims' wallets (containing their credit cards as well as cash). The males had also stolen the victims' phones and jewelry (including two custom wedding bands). The keys to both victims' vehicles had been placed inside the dryer. Victim-3 and Victim-4 both believe they were drugged with an unknown substance without their knowledge or consent.

B. Ring Camera and Other Surveillance Footage

48.     Victim-3 and Victim-4 had a Ring camera on their door frame, which captured images of the three men who came to their residence on or about the evening of October 24, 2025. Screenshots from that camera footage appear below:



SUBJECT TWO                    GALLEGO                    SUBJECT THREE

49.     Local police also located surveillance footage from a 7-11 convenience store near the residence belonging to Victim-3 and Victim-4. The footage showed SUBJECT TWO and GALLEGO purchasing a case of beer prior to meeting Victim-3 and Victim-4:




SUBJECT TWO                                    GALLEGO

## C. Additional Financial Impact of the Scheme on Victim-4

50.     Victim-3 and Victim-4 have provided law enforcement with evidence indicating that many of Victim-4's financial accounts were compromised after October 24, 2025. There were substantial fraudulent charges on Victim-4's credit cards (including an almost $15,000 shopping spree at a local Apple Store) and fraudulent wire transfers.

51.     **CITIBANK.** After October 24, 2025, the credit limit on one of Victim-4's Citibank credit cards was raised from $30,000 to $42,000. Victim-4 did not authorize this increase. Additionally, Victim-4 discovered three unauthorized payments from a Citibank account to pay off the credit card transactions on Victim-4's credit card (on or about October 24, 2025, for $665 and $2,500, and on or about October 25, 2025, for $20,471.09). On or about October 24, 2025, there was also an electronic transfer of $2,000 from Victim-4's Citibank account to a Bancolombia account in the name of "Capera" (via Western Union). Bancolombia is a Colombian bank. Neither Victim-4 nor Victim-3 authorized this transfer. Neither are familiar with the recipient. Finally, on or about October 25, 2025, there was a $258.58 charge at a Denny's Restaurant using Victim-4's Citibank card. Neither Victim-4 nor Victim-3 authorized this transaction. Surveillance footage

from the relevant Denny's Restaurant at or around the time of the transaction appears to show GALLEGO present in the restaurant:



52.     **GOLDMAN SACHS APPLE CARD**. On or about October 31, 2025, Victim-4 received a notification from LifeLock—an identity theft protection company—regarding a new Apple credit card (issued, via an Apple partnership, by Goldman Sachs) opened under Victim-4's name on or about October 24, 2025. The LifeLock notification indicated a last reported balance of $3,404.00. Neither Victim-4 nor Victim-3 authorized the opening of this account or any charges related to the account.

53.     **CHASE INK BUSINESS CREDIT CARD**. Victim-4 provided the following account of fraudulent charges made on or about October 25, 2025, on his Chase Ink business credit card:

- Apple Store #R185—$2,127.88

- Apple Store #R185—$1,596.44

- Apple Store #R185—$2,128.94

- Apple Store #R185—$2,128.94

- Apple Store #R185—$3,403.76

- Apple Store #R185—$3,087.44

23

Neither Victim-4 nor Victim-3 authorized any of the above charges. Chase was federally insured at all relevant times.

54. **PAYPAL/XOOM.** Victim-4 provided an email showing a failed transfer via a PayPal subsidiary called Xoom to an individual named "Paula Capera" for $6,500 on or about October 24, 2025, at approximately 11:47 p.m. Victim-4 provided an email showing another failed Xoom transfer to "Paula Capera" for $6,500 a few hours after the first attempted transaction, on or about October 25, 2025, at approximately 2:53 a.m. The recipient bank account was a Bancolombia account. Neither Victim-4 nor Victim-3 authorized this transaction, and neither are familiar with the recipient.

55. **SYNCHRONY BANK.** Victim-4 provided a letter sent by Synchrony Bank—an issuer of PayPal branded credit cards—indicating that an unknown individual or individuals attempted to open a PayPal credit card in Victim-4's name. The letter provided, in pertinent part, that "[t]he Synchrony Fraud Solutions team has reviewed your claim and found the PayPal Credit Card account was not opened by you."

56. **CASHAPP.** Victim-4 provided a screenshot from CashApp (a peer-to-peer mobile payment application enabling money transfers) showing a number of unauthorized transactions involving efforts to transfer money between Victim-4's CashApp account and a Chase bank account.

D. GALLEGO and SUBJECT TWO Leave the United States

57. On or about October 25, 2025, flight records reflect that GALLEGO departed Miami and returned to Colombia. On or about October 26, 2025, flight records reflect that SUBJECT TWO departed Miami and returned to Colombia.

24

58.     Photographs taken of GALLEGO and SUBJECT TWO were utilized to generate a photo lineup of both potential suspects. Victim-3 identified SUBJECT TWO in one of the line-ups, but identified a different individual (not believed to be connected to the offenses described here) in a line-up that contained a photograph of GALLEGO. Victim-4 identified SUBJECT TWO and GALLEGO in the line-ups, but also identified a different individual (not believed to be connected to the offenses described here) as the third perpetrator.

59.     Orange County law enforcement subsequently obtained arrest warrants for GALLEGO and SUBJECT TWO in connection with these events.

**IV.     Gallego's Arrests and Interview**

60.     On or about December 23, 2025, flight records reflect that GALLEGO flew from Colombia to Houston, Texas.

61.     On or about January 1, 2025, GALLEGO was attempting to fly from Dallas Fort-Worth Airport to El Salvador International Airport. At that time, he was arrested on the Orange County warrants.

62.     Additionally, local law enforcement in Miami had been investigating the drugging of (and theft from) Victim-1. After Victim-1 identified GALLEGO as the heavyset individual who had drugged and stolen from him, Miami-Dade County law enforcement obtained an arrest warrant for GALLEGO.  After GALLEGO posted bail on the Orange County case, he was extradited to Miami and booked on the Miami-Dade charges.

63.     On or about February 25, 2026, GALLEGO was interviewed by a Miami Beach Police Department detective as well as HSI special agents. Law enforcement read GALLEGO his *Miranda* rights.

25

64.     During the subsequent interview, GALLEGO identified still photos of SUBJECT TWO and SUBJECT THREE. GALLEGO stated that he has known SUBJECT TWO for two to three years and explained that, while they were in Colombia, SUBJECT TWO invited GALLEGO to come to the United States to assist SUBJECT TWO with his "business." GALLEGO explained that the "business" involved shopping and that GALLEGO's role was to assist in translating because SUBJECT TWO spoke inadequate English.[8]

65.     GALLEGO stated that M.A.—the woman whose named was associated with the vehicle driven by the SUBJECTS at the Dadeland Mall—was his girlfriend and that she was not aware of the SUBJECTS' activities. GALLEGO stated that M.A. paid for their rental car and lodging using her credit card.

## CONCLUSION

66.     Based upon the foregoing, I submit that there is probable cause for the proposed complaint charging GALLEGO with the SUBJECT OFFENSES.

ABDUL MAJEED
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time this, __26__ day of March 2026.

HONORABLE LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE

---

[8] Investigators believe this to be false. Numerous interviews with other victims indicated that SUBJECT TWO is particularly fluent in English.

26